# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **SUZANNE LEE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:06-CV-380-RDP** |
| | } | |
| **BELLSOUTH** | } | |
| **TELECOMMUNICATIONS, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Pending before the court are Plaintiff's Motion for Summary Judgment (Doc. # 11) and Defendant's Motion for Summary Judgment (Doc. # 13), which were both filed on February 19, 2007.  The motions were under submission, without oral argument, as of March 23, 2007.

Plaintiff Suzanne Lee filed this action in this court on February 27, 2006, alleging that Defendant "arbitrarily and capriciously denied plaintiff benefits under the terms of the Short Term Disability Plan" in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. (hereafter "ERISA"; Complaint, ¶¶ 1, 4).  Plaintiff also alleges a claim for benefits under the Long Term Disability Plan.  (Complaint, ¶¶ 9-12).  For the reasons set forth below, the court finds Plaintiff's Motion for Summary Judgment is due to be denied and Defendant's Motion for Summary Judgment is due to be granted.

## I.    Legal Standards for Evaluating a Summary Judgment Motion

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R .CIV. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson,* 477 U.S. at  248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id.* at 249.  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

The method used by the party moving for summary judgment to discharge its initial burden on the motion depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial.  *See Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

2

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial.  But it does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case.  *See Fitzpatrick*, 2 F.3d at 1115–16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## II.    Relevant Undisputed Facts[1]

### A.    BellSouth's Disability Plans

Several BellSouth corporations, including BellSouth Technology Group ("BTG"), jointly sponsor and contribute to the BellSouth Corporation Health Care Trust - Employees (the "Trust"), to provide health care and disability benefits to active BellSouth employees.  (Avery Aff. at ¶ 3).[2]

_____

[1]If facts are in dispute, the court has noted the dispute, but will "resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal quotations omitted).

[2] The court notes that the parties disagree about certain aspects of management of the Trust which Plaintiff claims demonstrate that the Trust is a mere illusion and that BellSouth actually controls the payment of claims. The court will not recount those disputes in detail here, however, because it finds that in light of the opinion in *Burroughs v. BellSouth Telecommunications, Inc.*, 2007 WL 1954050 (11th Cir. July 6, 2007), the parties' views on how the Trust is managed are simply not material to the court's analysis. (*See* discussion *infra* Section III.A.1). Plaintiff herself concedes that, with one non-material exception, the Trust at issue in this case is identical to the Trust employed by BellSouth in *Burroughs*. (Doc. # 15, at 14-15 (pointing out that the *only difference* between the LTD Plan in *Burroughs* and the STD Plan in this case is that with regard to the former, the Trust paid the beneficiaries directly whereas with respect to the latter, the Trust pays BellSouth)). Because the "illusionary trust" argument was rejected by the Eleventh Circuit in *Burroughs*, the court finds that the parties' disputes about the facts relevant to that argument are immaterial here.

Nonetheless, the court notes the following facts concerning the Trust that are undisputed. State Street Bank and Trust Company ("State Street"), a trust company independent of BellSouth, serves as Trustee. (Avery Aff. at ¶ 11). As Trustee, State Street is responsible for the management of Trust assets and has certain fiduciary responsibilities with respect to the Trust assets. (Avery Aff. at ¶ 11). CCA Strategies, LLC ("CCA") and, prior to 2005, Mercer Human Resources Consulting, both independent actuarial and consulting firms, have calculated each year on an actuarial basis the annual contribution to be made by each BellSouth affiliate participating in the plans for the following year. (Avery Aff. at ¶ 8). CCA's actuarial calculations are intended to maintain a funding level sufficient to cover all claims for current cases and to maintain a reserve for incurred but unreported claims. (Avery Aff. at ¶ 8). This reserve is intended to cover claims of individuals who have become disabled but not yet submitted claims or had them approved. (Avery Aff. at ¶ 8). This reserve is maintained in the Trust on a continuing basis and recalculated by CCA each year. (Avery Aff. at ¶ 8). If claims materially exceed the aggregate contributions to the Trust, CCA will perform an interim calculation to determine how much each participating company's monthly contribution should be increased to ensure sufficient assets and reserves in the Trust. (Avery Aff. at ¶ 9). Contributions are not adjusted on a monthly (or more frequent) basis and the Trust is not "zeroed out." (Avery Aff. at ¶ 9). If contributions exceed claims, surplus funds accumulated in the Trust

4

The BellSouth Short Term Disability ("STD") and Long Term Disability ("LTD") Plans have consistently been treated by BellSouth as plans subject to ERISA. (Avery Aff. at ¶ 5). BellSouth has issued "summary plan descriptions" setting forth the terms of each plan, has maintained formal plan documents for each plan, has issued "Summary Annual Reports" describing the payments to and from the plans, and as noted above, has filed annually Form 5500 for both plans. (Avery Aff. at ¶ 5).

The decision to deny Plaintiff's claim for short-term disability benefits was made by Broadspire Services, Inc. ("Broadspire"), the third-party administrator for the STD Plan. BellSouth has engaged Broadspire[3] a company independent of BellSouth, to act as the third party administrator for the STD and LTD Plans. (Avery Aff. at ¶ 12). Broadspire is responsible for the administration of all disability claims and approves or denies claims for STD and LTD benefits. (Avery Aff. at ¶ 12; Russell-Powell Dec. at ¶ 3). STD benefit claims approved by Broadspire are initially paid through BellSouth's payroll. (Avery Aff. at ¶ 13). BellSouth is fully reimbursed by the Trust for all STD payments no later than the 12th business day of the month following the payment to the claimants. (Avery Aff. at ¶ 13). BellSouth entities do not provide any type of monetary or non-monetary incentive to Broadspire employees or members of the Appeal Review Committee in exchange for determinations that applicants do not meet the definition of disability under the disability plans offered to BellSouth employees. (Russell-Powell Dec. at ¶ 8).

_____

are added to reserves and carried over to future years and used to pay claims. (Avery Aff. at ¶ 9).

[3] Aetna purchased the disability operations of Broadspire on or about April 1, 2006. (Russell-Powell Dec. at ¶ 4). Broadspire was formerly known as NATLSCO, Inc., which traded as Kemper Services. (Russell-Powell Dec. at ¶ 5). For the purposes of this opinion, the court will refer to this entity as "Broadspire."

Under the terms of the BellSouth STD Plan, Lee was entitled to receive disability benefits if she suffers from "a medical condition, supported by objective medical evidence, which . . . makes [her] unable to perform any type of work as a result of a physical or mental illness or an accidental injury. . .." (Doc. # 14, at Ex. 4 p BST 084). This definition further explains that any type of work includes the participant's regular job with or without accommodations, any other Participating Company job (regardless of availability) with or without accommodations, or temporary modified duties. (Doc. # 14, at Ex. 4 p BST084). The full definition of "disability" is as follows:

> As of the eighth consecutive calendar Day of Absence a medical condition supported by objective medical evidence, which (I) makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury or (ii) results in a Participant receiving treatment that qualifies as a Chemical Dependency Confinement. "Any type of work" includes the following regardless of availability: (a) the Participant's regular job with or without accommodations, (b) any other Participating Company job with or without accommodations, or (c) temporary modified duties. "A Participating Company job" is any job within a Participating Company or any job outside a Participating Company, which is comparable in skills and functions. A "Chemical Dependency Confinement" means any period of continuous confinement for drug or alcohol dependency, which initially occurs on or after May 15, 2001 (or such confinement for which an appeal is pending and has not been ultimately determined in accordance with the claims and appeals provisions of the Plan) and which is approved by or covered under the applicable BellSouth or Affiliate sponsored group health plan covering the Participant (or would be approved by or covered under such applicable group health plan if the Participant had not waived such coverage). A Participant subject to a Disability is referred to as being "Disabled".

(Russell-Powell Dec. at ¶ 12).

The BellSouth LTD Plan defines disability to mean "a continuous physical or mental illness, whether work related or non-work related, which makes a participant unable to perform any type of work other than one which pays less than half of his annual compensation at the time his benefits under the Short Term Disability Plan began." (Doc. # 14, at Ex. 5 BST116). The LTD Plan requires

that a participant receive 52 weeks of Short Term Disability Plan payments before LTD Plan benefits can be paid. (Doc. # 14, at Ex. 5 p BST118).  Under the terms of the LTD Plan, only former employees may receive LTD benefits.  (Avery Aff. at ¶ 14).  Consequently, tax withholding and other deductions for LTD recipients differ from the tax withholding and other deductions applicable to current employees receiving STD benefits.  (Avery Aff. at ¶ 14).  Moreover, LTD is generally paid only to former employees who meet the definition of disability under the LTD Plan and who rarely return to the active payroll.  (Avery Aff. at ¶ 14).  The Trust therefore does not utilize BellSouth's payroll system to make LTD payments; instead, LTD benefits are paid directly from the Trust by State Street as Trustee.  (Avery Aff. at ¶ 14).

**B.     History of Plaintiff's Employment with BellSouth and Her Benefits Claims**

Lee was hired by BellSouth Technology Group, Inc. ("BTG") on July 5, 1994, and was employed in a management position from July 1, 2000 through May 4, 2005.  (Service and Salary History, BST 0001-0004).  Lee's first day absent for thoracic spine pain was January 18, 2005.  (BRO 129, 192; Russell-Powell Dec. at ¶ 18).  On January 24, 2005, she filed a Short Term Disability Plan benefit claim, which would have been effective the following day, or seven days after she was unable to continue to work. (Doc. # 14, at Ex. 3 p. BRO 0129, 0147).  However, Lee was never approved for Short Term Disability benefits under STD Case No. 1440331.  (Russell-Powell Dec. at ¶ 19). Lee's treatment providers were contacted several times, but no medical information was sent to Broadspire and, therefore, the STD denial effective January 25, 2005 was communicated to Lee via correspondence dated February 4, 2005.  (BRO 194-95).

On March 30, 2005, Lee submitted FMLA Application for Leave forms. (Doc. # 14, at Ex. 1 p. BRO206-08).  On April 26, 2005, Lee requested an appeal of her STD denial.  (BRO 215;

Russell-Powell Dec. at ¶ 37).  That same day, April 26, 2005, Defendant sent a letter to Plaintiff notifying her that her FMLA hours had been exhausted, she was expected to return to work full-time, and if she did not return to work by May 4, 2005, her employment would be terminated. (Doc. # 14, at Ex. 6, p. Lee 01).  By letter dated May 12, 2005, Plaintiff was notified that because she did not return to work by the required date, and because she had exhausted any leave available, her employment was terminated effective May 4, 2005. (Doc. # 14, at Ex. 6, p. Lee 02).

On May 19, 2005, Claudia Russell-Powell sent a letter to Lee notifying her that the appeal was being placed on hold until Broadspire received the materials Lee wished to be considered. (BRO 228; Russell-Powell Dec. at ¶ 44).   As a consequence of Lee's employment being terminated on May 12, 2005, retroactive to May 4, 2005, Broadspire ceased collecting medical information on Lee. (Doc. # 14, at Ex. 6 p Lee 2; Doc. # 14, at Ex. 3 p BRO178-79; Doc. # 14, at Ex. 2 p BRO239).

On June 30, 2005, a summary of Lee's treatment providers was submitted to Broadspire. (BRO 230-32; Russell-Powell Dec. at ¶ 46).  On July 1, 2005, Claudia Russell-Powell sent a letter to Lee confirming that Broadspire had received all the medical information she intended to submit and would continue its appeal.  (BRO 233; Russell-Powell Dec. at ¶ 47).  Dr. Vaughn Cohan performed a Peer Review of Lee's medical information on July 19, 2005 and found a split recommendation – he found the medical data supported impairment from May 16, 2005 to the time of his review and did not support impairment for the time period of January 25, 2005 through May 15, 2005.  (BRO 234-37; Russell-Powell Dec. at ¶ 48).

Pursuant to a letter dated July 27, 2005, STD benefits were reinstated effective May 16, 2005 and the benefits denial for January 25, 2005 through May 15, 2005 was sent to the Appeals Committee for a final determination.  (BRO 238; Russell-Powell Dec. at ¶ 49).  However, it was

8

soon determined that Lee was not eligible for STD benefits beginning May 16, 2005 because she had left employment as of May 4, 2005. (BRO 241). Thereafter, on August 5, 2005, Broadspire wrote Lee stating that her benefits were denied from January 25, 2005 to May 10, 2005 because its claims adjuster determined that there was no objective evidence of a complete loss of function, and that her claim for benefits from May 11, 2005 to the present was denied because Lee's employment had been terminated effective May 4, 2005. (Doc. # 14, at Ex. 2 p BRO239-41; Russell-Powell Dec. at ¶ 51).

### C.    Medical Information Regarding Plaintiff's 2005 Benefits Claim

The medical evidence supporting Plaintiff's benefits claim can be described as follows. Dr. Cheryl Goyne of the Birmingham Pain Center provided a statement dated February 3, 2005 (which was based on an office visit on December 20, 2004) which states:

> I have been treating Ms. Suzanne Lee for her chronic pain syndrome since January 28, 2004. She suffers from chronic thoracic spine pain secondary to thoracic disc disease. Unfortunately, despite her treatment, she has persistent, intractable pain. It is my understanding that she is unable to sit for more than 1 ½ hours at time. She cannot stand for more than 15 minutes or walk for more than 10-15 minutes at time. She is unable to work for more than 2-4 hours a day.

(Doc. # 14, at Ex. 1 p. BRO0193). Dr. Goyne also identified Lee's restrictions – unable to sit for more than 1 ½ hours at a time; cannot stand for more than 15 minutes or walk for more than 10-15 minutes at a time; and unable to work for more than 2-4 hours per day. (BRO 193; Russell-Powell Dec. at ¶ 20).[4]  A Physicians Progress Report dated February 7, 2005 (also based on the December 20, 2004 office visit) was submitted by Dr. Goyne's office, and it stated that Lee was unable to work full duty, but was able to return to work in a modified/light duty capacity for an indefinite period of time. (BRO 197, 193; Russell-Powell Dec. at ¶ 24). An Attending Physician's Statement dated

---

[4] Although Dr. Goyne's statement was not received before the initial STD denial letter was mailed to Lee  (Russell-Powell Dec. at ¶ 21), it was received and considered for the final decision.

February 7, 2005 identified functional limitations for Lee which included occasional walking, reaching, lifting 5-10 lbs. and carrying 10 lbs. (BRO 200; Russell-Powell Dec. at ¶ 25; Doc. # 14, at Ex. 1 p BRO200).

Dr. Wayne Gossman submitted a letter dated February 7, 2005 wherein he described Lee's condition and indicated that BellSouth had been accommodating her in exceptional ways, as she had only been working 2-3 hours per day for more than a year. (BRO 198-99; Russell-Powell Dec. at ¶ 26). Dr. Grossman's letter states:

> Suzanne Lee has seen me on three occasions in the context of her treatment here at the Birmingham Pain center, first in August and November of 2004 and most recently January 20th,2005. Her treatment and evaluation includes these visits, as well as her medical records and a full psychological evaluation done by Dr. Heisler. It was apparent from the very beginning that, in addition to being very anxious and upset about her pain and physical limitations, she had very severe muscle spasm complicating her treatment. She was placed on Valium for the treatment of her anxiety and muscle spasm. She reported a remarkable improvement, at the cost of some element of sedation. Adjustments were attempted, yet without significant success. Currently, she obtains some element of relief, only at the cost of seriously limiting sedation. I believe it may take some time to find a solution to this problem. More importantly, however, it became clear at our most recent appointment, that this lady seriously understates her difficulties. At the time of psychological testing in March of 2004, she was depressed, suicidal, crying daily, and had poor concentration. She reported improvement after that, and fought hard, but I think much of her reported improvement was wishful thinking. When I have seen her before she has always apologized for having a bad day, explaining how much treatment was helping her. At her most recent appointment [January 20, 2005], after her Valium had been decreased because of sedation, she was in extreme pain, splinting nearly every movement, and could hardly talk or breath smoothly because of the severity of the spasm. This was my first occasion to see her walk into my office. Usually she is already sitting down. I was so alarmed at how unsteady and limited her gait was; I almost got a nurse to assist. I did assist her myself. Asking details about this, I felt the need to discuss it with her boyfriend, both because of her difficulty breathing and my desire for another's perspective. He related that she is this way most of the time. It was somewhat better when she was on a higher dose of Valium, but the sedation it caused was severe and sustained. I further discovered, that though she has seen herself as fully employed, her employer has been accommodating her in exceptional ways, and she has only been working 2-3 hours per day for more than a year. If her

productivity has been in any way acceptable during this period, I expect it is only because of her drive and determination.  She is now exceptionally distressed for a variety of reasons: First, the failure to resolve the issue of her sedation without loss of progress regarding her severe pain; Second, Dr. Goyne has recommended a program of exercise and stretching that, though it may be helpful, is not compatible with her work schedule, limited as it is; and Finally, her employers efforts to keep her on staff with her current, severely limited productivity appear to be coming to an end. (In fact, I have today gotten word that she has been terminated.)

I think it is clear that she needs to go on disability and discontinue trying to work part time.  She is already extremely limited as it is, and she needs to be able to focus on her treatment and salvaging what functioning she can.  This is a long term, possibly permanent treatment necessity.

I took the time and opportunity to speak with her mother today.  Her mother confirmed that the condition she has been in when she comes for her appointments is in fact her normal state.

I would add that she has problems with concentration and memory and this is common with depression and severe chronic pain.  If she has missed deadlines or confused instructions regarding completing paperwork, that could be consistent with her illness.

I have attempted to complete some of the forms given to me today, but much of it is asking about specific tests and observations that I would need to do at the time of any appointment.  I would be glad to complete this in more detail at the patient's next appointment.  If needed, I will try to work her in sooner than already scheduled.

Finally, I have had an opportunity to see Dr. Goyne's note, discussing the patient's report that she is able to sit for 1 ½ hours at a time.  It should be noted that she is only able to sit that long with sedating medications, extreme distracting pain, or both.

(Doc. # 14, at Ex. 1 p BRO0198-99).

On February 17, 2005, Dr. Gerald Goldberg (a neurologist) performed a Peer Review of the

medical information received from Drs. Goyne and Gossman and found that the information failed

to support impairment for the entire time frame.  (BRO 201-202; Russell-Powell Dec. at ¶ 27).[5]

_____

[5] On February 25, 2005, Broadspire sent a letter to Lee notifying her that medical records had been received by the Appeal Department but without a formal appeal request they would not be reviewed.  (BRO 203; Russell-Powell Dec. at ¶ 28).  Through correspondence referencing a

On April 5, 2005, Lee had a thoracic MRI, and the report submitted to Broadspire showed a right-sided disc herniation at T6-7 and a left-sided disc herniation at T11-12. (Doc. # 14, at Ex. 1 p BRO0209; Russell-Powell Dec. at ¶ 31).  On April 8, 2005, Dr. Michael Gibson performed a chart review of Lee's medical charts at Birmingham Pain Center (as he took over for Dr. Goyne who was no longer at the Center) and made the following statements:

> Lee's first visit was 1/20/04 where she was evaluated by Dr. Goyne and found to have disabling upper thoracic spine pain without myelopathy.
>
> . . .
>
> [Referring to MRI's done in Feb 2004 and Nov 2003] It is very clear that this condition has worsened between November 10, 2003 and February 2004, at least on the basis of the readings by the radiologist.
>
> . . .
>
> She was tested psychologically and found to be severely depressed, which is the result [of] her medical condition also with somatization disorder.  Her somatic response and severe levels of distress cause some dysfunction, as well.
>
> . . .
>
> Botox injections were performed 04/05/04 for intractable muscle spasms of the thoracic spine.
>
> . . .
>
> Through the course of the next several months and up to the present day, she basically has been maintained on oral opioids and other medications for her co-morbid.   Medications are primarily OxyContin 20mg 4 times a day, Wellbutrin-XL 150mg daily, and Valium 10mg 3 times a day for intractable spasm. Upon my evaluation of her on March 29, 2005, she was found to be extremely depressed, somewhat anxious about her present situation.
>
> . . .
>
> Her pain complaints are very consistent with her medical findings and I would rate them as very severe.  In fact she rates her pain 10/10 despite treatment.
>
> . . .
>
> As far as her ability to work, it is very clear that this woman is permanently and totally disabled because of this condition.  She will be disabled for greater than two

discussion with Broadspire on March 15, 2005, Lee requested hard copies of her entire case file, clarification regarding medical data that could be provided for consideration, instructions on the appeal process, and that her fiancé, Donald Scott, be appointed as her agent to interact on her behalf with respect to the benefits case and forthcoming appeal.  (BRO 204-05; Russell-Powell Dec. at ¶ 29).  Pursuant to Lee's request, hard copies of her benefits file were sent via letter dated April 8, 2005.  (BRO 210; Russell-Powell Dec. at ¶ 32).

years and therefore meets all Department of Labor criteria for vocationally disabled, especially when considering the severity of her depression as well as the severity of her pain and lack of control.  She has marked dysfunction physically as a result of thoracic disc herniation.  These are exquisitely painful problems and most people who have these become permanently and totally disabled as a result thereof because there is no definitive treatment for it.

(Doc. # 14, at Ex. 1 p BRO0211-12).

On April 21, 2005, Dr. Keith Howard Langford submitted a letter to Dr. Michael Gibson discussing Lee's condition. (BRO 275-76; Russell-Powell Dec. at ¶ 34).  In that letter, he opined that a review of the MRI scan showed a herniated disc at C6-7, but that the radiologist correctly pointed out that there was no contact with the spinal cord, no proof of a nerve being pinched, and there was plenty of space available at the level of the foramina.  (BRO 218; Russell-Powell Dec. at ¶ 35). The letter also stated that the second disc herniation at T11-12 was much less significant.  (BRO 218; Russell-Powell Dec. at ¶ 36). Dr. Langford's letter also stated:

I have had a very sad time discussing this problem with the patient and her mother and aunt.
      . . .
The pain has remained in the same area ever since but at first was intermittent.  It is at the level of the tip of the scapula on the right side of the spinal column two fingers' breadth away from the midline.  It is a sharp pain like a knife and when extremely severe or aggravated it runs through the chest to the front but does not radiate.
      . . .
In April 2003, because of the return of the pain, she had another injection which did not at first relieve her but by the end of June she had found it tapered off significantly.  At the end of September 2003 she had a sudden recurrence of the pain. She was sitting on the floor whilst her fiancé was putting a desk together from component parts.  She was not doing any lifting but obviously was sitting in a crouched position on the floor with her spine bent forward.  Eventually, because of the persistence of the pain, she again had an injection but this time thee was no relief and in fact by 6pm that night she had extremely severe pain which interfered with her breathing and any movement.  Since that time, she has been treated for this severe chronic pain and is on heavy narcotic doses with Oxycontin which she takes on a regular basis and in fact she had her alarm go off whilst I was talking to her and it was time for one of her tablets.  The pain is so intense that any movement will

aggravate it and she is unable to put her bra on nor indeed even her trousers.  She has to have help with practically everything and her fiancé astonishingly has given up his job and moved to Birmingham to care for her.

Added to this constant pain is a collection of pains which she concludes are the result of positions she is forced to remain in to avoid aggravating her pain.  The most severe of these is a pain at the base of her left thumb where there is a certain amount of swelling to be seen.  The right hand has a similar pain but no swelling.  She is very sensitive to the slightest touch or movement of that thumb and although she can move it, it is very limited.  She has pain in the shoulders and pains in the joints of the legs and also when lying in positions for long periods of time such as in sleep she develops numbness which goes away as the moves around with care.  She has problems with constipation and she now ranges between 95-100 pounds having been 120 pounds at the start of her problem.  She relates problems last year when she had white spots and swelling on the knuckles of her right hand and it was concluded eventually that this was because she had bruised the hand against the headboard of her bed.

. . .

The patient complained of memory problems but the heavy narcotic does undoubtedly must have some effect on her mental process.

The other important thing to note is that the patient moves with extreme care and when I entered the examination room, she was sitting on the couch with her back against the wall and was virtually immobile and even her speech was very limited since even this seemed to aggravate her pain to some degree.  She walked down the corridor with very great care not to cause any increase or aggravation and I would say she showed every evidence of being in extreme pain despite the medication.

(Doc. # 14, at Ex. 1 p. BRO213, 218).

Lee underwent a CT scan of her spine on April 30, 2005, that indicated no evidence of a

fracture, osteophyte formation or spinal stenosis and no mechanical spinal cord deformity.  (BRO

219; Russell-Powell Dec. at ¶ 39).  According to Dr. Pritchard's office visit notes dated May 6, 2005,

the CT scan did not show any calcification to the disc herniation and Lee's strength was rated as 5/5.

(BRO 221-23; Russell-Powell Dec. at ¶ 40).  However, the scan did reveal  T6-7 disk herniation and

T11-12 disc protrusion, so Dr. Pritchard recommended to Lee the possibility of performing a thoracic

diacectomy, a minimally invasive approach to remove the disk herniation at T6-T7 and resolve some of her pain.  (BRO0219, BRO 221; Russell-Powell Dec. at ¶ 41).

The microendoscopic diskectomy surgery was scheduled for May 16, 2005.  (BRO 221, 224; Russell-Powell Dec. at ¶ 42).   On May 11, 2005, Dr. Pritchard prepared a letter confirming the surgery scheduled for May 16, 2005 and stating that it was undetermined at that time when she would be able to return to work.  (BRO 225; Russell-Powell Dec. at ¶ 43).  Dr. Pritchard's notes from Lee's first postoperative outpatient visit on May 31, 2005 stated that Lee appeared to have improved somewhat.  (BRO 229; Russell-Powell Dec. at ¶ 45).

### D.    Medical Information Relating to Plaintiff's Previous Benefit Claims

On October 1, 2003, Lee was examined by Dr. Bradley Goodman.  Dr. Goodman reported that his palpation revealed pain along the T6, T8 area. (Doc. # 14, at Ex. 1 p BRO086-BRO087). Thereafter, Dr. Robert Poczateh dictated a report noting that Lee's back pain had flared up since previous visits and that there was tenderness in the T6, T8 area upon physical examination. (Doc. # 14, at Ex. 1 p BRO086).

On October 17, 2003, Lee underwent a general epidural steroid injection at Right T8, T9. (Doc. # 14, at Ex. 1 p BRO088)  On October 27, 2003, Dr. Goodman examined Lee and reported severe distress because of her back pain, noting her walk was slowed and that she continued to take Oxycontin 10mg every 12 hours and OxyIR 5mg for migraines. (Doc. # 14, at Ex. 1 p BRO089).

On November 4 and 10, 2003, Dr. Charlie Talbert examined Lee and noted her pain was continuing, therapy was ongoing, and that the MRI showed degenerative changes but no injury from the epidural block. (Doc. # 14, at Ex. 1 p BRO090).  Also on November 10, 2003, the physical

therapy notes showed Lee was having difficulty moving and recorded psychiatric evaluation for pain and possible anorexia. (Doc. # 14, at Ex. 1 p BRO092).

On November 10, 2003, Dr. Tolbert noted that Lee was able to work. (Doc. # 14, at Ex. 1 p BRO080).  On January 26, 2004, a Functional Capacity Evaluation was attempted, but the report showed Lee was in too much pain to complete the tests. (Doc. # 14, at Ex. 1 p BRO077).  On April 30, 2004, Dr. Cheryl Goyne wrote a letter to Broadspire/Kemper stating:

> As you know, Lee has been unable to work since October 16 of 2003.  At this time, she is planning to attempt to return to work next week, part-time, out of the home, after accommodations and modifications are made with the help of occupational therapy.  Between the time period of October 16, 2003 and now, however, Lee has been totally disabled.  She had problems with intermittent thoracic spine pain, which had generally been well-controlled with intermittent epidural steroid injections.  However, since her last exacerbation in October, her pain actually escalated after the block that was performed October 17, and she has had constant, chronic pain, Her pain is in the right paraspinal thoracic region.  Imaging with both CT myelogram and MRI reveal disc pathology at multiple levels.  Unfortunately, at this time, the patient requires very frequent breaks, i.e. she will need tremendous flexibility with regard to being able to change positions from seated to standing.  She will not be able to lift or carry anything greater than five pounds.  Even ambulation is limited in that she is unable to ambulate with any reasonable speed, again due to chronic pain. Her case is now complicated by situational severe depression.  She is being aggressively treated and is showing some signs of gradual improvement.  As stated above, she is attempting to return to work part-time next week, but for the past several months, has clearly been totally disabled.

(Doc. # 14, at Ex. 1 p BRO055).

## III.   DISCUSSION

### A.   Denial of Short-Term Disability Benefits

ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries.

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989); *Shaw v. Connecticut Gen. Life Ins. Co.*, 353 F.3d 1276, 1282 (11th Cir.2003); *Marecek v. BellSouth Telecomms., Inc.*, 49 F.3d 702, 705

(11th Cir.1995).   However, our Circuit "has adopted the following standards for reviewing administrators' plan interpretations: (1) *de novo* where the plan does not grant the administrator discretion, (2) arbitrary and capricious when the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest." *Buckley v. Metro. Life*, 115 F.3d 936, 939 (11th Cir.1997).[6]  In *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132 (11th Cir. 2004), the Eleventh Circuit recapitulated the multi-step approach to be utilized in judicially reviewing almost all ERISA plan benefit denials:

> (1)   Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2)   If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3)   If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4)   If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5)   If there is no conflict, then end the inquiry and affirm the decision.
>
> (6)   If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Id.* at 1138.

---

[6] This Circuit has applied the three levels of review to both plan interpretations and factual determinations.  *See Torres v. Pittston Co.*, 346 F.3d 1324 (11th Cir.2003).

17

Thus, the first step for this court in analyzing Plaintiff's claim is to determine whether Broadspire was "wrong" in denying Plaintiff's claim for short-term disability benefits.  The reasons for the denial of Plaintiff's claim for short-term disability benefits for the period from January 25, 2005 until May 4, 2005 (her last date of employment) are set forth in detail in the final denial letter dated August 5, 2005 from Broadspire.  (Doc. # 14, Ex. 2, at 11-14).  The letter indicates that all of the medical information submitted by Plaintiff was reviewed and considered and peer reviews were conducted. In this case, the court will assume, without deciding, that Broadspire's decision to deny Plaintiff STD benefits was wrong.

### 1.    Determination of Which Standard of Review Applies to the Decision

The court's analysis, therefore, turns to the appropriate standard of review to be applied in this case. Here, it is undisputed that the STD Plan at issue expressly grants "discretion" to Broadspire as Plan Administrator.[7]  Thus, it is clear that a *de novo* standard does not apply to the decision to

---

[7] Section 6.1 of BellSouth's STD Plan states:

The Plan Administrator shall have . . . all discretionary authority and powers necessary to enable it to carry out its duties and discharge its responsibilities under the Plan.  The powers and duties of the Plan Administrator include:
. . .
(b)    To interpret and construe, in its sole discretion, the Plan, and to decide all questions of eligibility of any person to participate in the Plan or to receive Benefits under it, and its interpretation thereof shall be final and conclusive;

(c)    To determine, in its sole discretion, the amount, manner, and time of payment of benefits, which shall be payable to any Participant, in accordance with the provisions of the Plan, and to determine the person or persons to whom such benefits shall be paid;

(BellSouth STD Plan at pp. 11-12; BST 0093-94).  The Summary Plan Description also states:

BellSouth Corporation . . . has delegated to Kemper National Services the duty to administer all claims for plan benefits for all participating companies.  The Claims

deny Plaintiff's claim for benefits. The parties dispute, however, whether the appropriate standard to be applied is the *regular* arbitrary and capricious standard that is akin to an abuse of discretion review, or whether the *heightened* arbitrary and capricious standard applicable to conflicted fiduciaries governs the decisions in this case.

Plaintiff relies on the Eleventh Circuit's decision in *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132 (11th Cir. 2004), and contends that, even though BellSouth employed Broadspire as its claims administrator with the authority to make decisions regarding benefit claims, the taint of self-interest still infected the decision here and thus requires the application of the heightened arbitrary and capricious standard. In *Williams*, the court considered whether the employment of a separate "claims administrator" to process and decide claims that were then paid by the company (who retained the "plan administrator" title) resolved the conflict.[8] *Williams*, 373 F.3d at 1136-37. The court found that based upon the facts in *Williams*, despite the employment of a separate claims administrator, "BellSouth nevertheless holds the ultimate power to do with claims as it wants; it just has to tell [the claims administrator] when to do it." *Williams*, 373 F.3d at 1136-37. As a result, the Eleventh Circuit concluded that "the conflict between BellSouth's fiduciary and profit-making interest, which triggers the heightened standard of review,

---

Administrator has complete discretionary authority to determine benefits under the STD Plan and to interpret the terms and provisions of the Plan regarding short-term disability benefit matters. Its determinations and interpretations are final and conclusive.

(SPD at p. 8; BST 0107).

[8] Prior to *Williams*, this Circuit had made clear that when a company both administers and funds a plan, a conflict of interest arises, thus triggering heightened arbitrary and capricious review. *See Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1562 (11th Cir.1990).

remains." *Williams*, 373 F.3d at 1136-37. Plaintiff notes that, in this case, the denial of Plaintiff's

STD claim saved BellSouth $52,090.40 in STD Plan benefits and, therefore, BellSouth directly

profited from the denial of benefits and a conflict of interest exists.  Accordingly, "[t]he [conflicted]

fiduciary ... should bear the burden of dispelling the notion that its conflict of interest has tainted its

judgment." *Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1568 (11th Cir.

1990).

In response, BellSouth argues that its use of the Trust from which disability benefits are paid

distinguishes this case from *Williams*[9] and negates any other argument that Broadspire was under any

conflict of interest which would necessitate a "heightened" arbitrary and capricious standard of

review. (Doc. # 17, at 8) ("The *Williams* Court did not analyze the effect of a trust for the payment

of benefits on the applicable standard of review.")).[10] As the court noted in *Brown,* "[t]he burden of

---

[9] Defendant also distinguishes *Williams* as follows:  (1) *Williams* considered the standard of review applicable to the BellSouth STD Plan for *represented* employees, as opposed to the STD Plan for *management* employees, which is the subject of this case; and (2) the contractual language relied upon by the Eleventh Circuit in the *Williams* case is no longer contained in the contract between BellSouth and Broadspire. Specifically, the contract between BellSouth and Broadspire has been amended to provide as follows:

> However, no provision of this Agreement shall permit, or be construed to permit BSC, its affiliates or any of their employees to provide instructions or direction to Broadspire in connection with Broadspire's approval or denial of claims for disability benefits under the respective plans.  Broadspire has sole and complete responsibility for determining whether a claimant is disabled under the terms of BSC's disability benefit plans, and discretionary authority to interpret or construe the plans to the extent necessary to determine a claimant's eligibility for benefits under the plans.

(Miller Aff. at ¶ 6 and Ex. A).

[10] The parties in this case dispute whether evidence of a trust was submitted to the *Williams* court.  It is clear that the opinion does not rely on any evidence of a trust, and indeed notes to the

20

demonstrating the reasons for a challenged plan interpretation will, by and large, draw a distinction between plans that are truly trusts and plans that are based solely on contracts or policies for insurance. Decisions on behalf of a plan in the form of a trust lend themselves less readily to the accusation of conflicting interests and are more easily justified." *Brown*, 898 F.2d at 1567.  Thus, "[t]hat plan administrators' decisions have had a favorable impact on the balance sheet of the trust itself, however, suggests no 'conflict of interest.'" *Brown,* 898 F.2d at 1567-68.

Plaintiff counters by claiming that the Trust is nothing more than an illusion or pass-through that does not insulate BellSouth from the taint of self-interest.  Unfortunately for Plaintiff, the recent decision of *Burroughs v. BellSouth Telecommunications, Inc.,* 2007 WL 1954050 (11th Cir. July 6, 2007), which was issued after the parties submitted their summary judgment materials in this case, flies in the face of that analysis and squarely rejects the district court's application of a heightened arbitrary and capricious standard based upon the very arguments made by Plaintiff here.   In *Burroughs*, the district court applied the heightened standard to a benefits decision made by BellSouth and Broadspire because it concluded that "no matter what entities in addition to [BellSouth] contributed to [BellSouth]'s denial decision and were interposed by [BellSouth] as insulators [through the trust vehicle], [BellSouth] was the actual decision-maker and was operating under a conflict-of-interest." *Burroughs v. BellSouth Tele., Inc.*, N.D. Ala. CV-01-AR-1863-M (July

---

contrary:

> BellSouth's disability plan is not a trust or otherwise self funded.  Rather, any
> benefits are paid directly out of BellSouth's operating expenses.  It is therefore, not
> in BellSouth's *financial* interest to approve disability benefit claims.

*Williams*, 373 F.3d at 1135, n. 4.

21, 2006) (Doc. # 16, Ex. 13, at 10).[11]   The Eleventh Circuit disagreed with the district court's analysis, and issued the following pithy holding which explicitly rejects the application of the heightened standard in that case and implicitly rejects the conclusion that the Trust employed by BellSouth to pay its claims is nothing more than a fiction:

> The 2002 documents for the Plan state the claims administrator has exclusive, final, discretionary authority to interpret the Plan and determine benefits. Under these circumstances, the proper standard of review for the benefits decision is arbitrary and capricious. See Buckley, 115 F.3d at 939. We have determined the district court applied the incorrect standard of review to the claims administrator's decision.

*Burroughs*, 2007 WL 1954050, at *1.

---

[11] Although the district court in *Burroughs* did not go to great lengths to explain the facts surrounding the trust in that case, it adopted the analysis outlined in *Carter v. BellSouth Telecommunications, Inc.*, 345 F.Supp. 2d 1296 (N.D. Ala. 2004) (which was vacated on the joint motion of the parties as part of a settlement reached during the pendency of appeal) which found, in pertinent part:

> The LTD plan is funded by contributions from BST and other BellSouth affiliates to a so-called irrevocable trust as to which State Street Bank is "trustee." . . . The "trust" exists only for the mechanical purpose of making payments to plan participants in the various employee benefit plans, including the LTD plan here involved. It is like a simple checking account replenished by the depositor just before it is overdrawn. It is an elaborate illusion. When Kemper [now Broadspire], the claims administrator, approves an application for benefits, an authorization of payment is sent to State Street Bank which routinely sends the payment to the beneficiary. State Street Bank exercises no discretion whatsoever. It cannot and does not employ independent judgment of the sort that a real trustee would employ. Its role is simply to follow the direction it receives and to disburse accordingly. The trust agreement expressly provides that State Street Bank can only "make such payment as BellSouth directs." ... Not only is the transparency of the "trust" now obvious to the court, but there is additional evidence that ultimately persuades the court. ... It is apparent not only from the paper trail but from what Ms. Miller said in her affidavit that any payment of benefits can adversely affect BST's bottom line.

*Carter*, 345 F.Supp.2d at 1298-1299.

This court cannot distinguish *Burroughs* from the facts of this case in any principled fashion. In a turn of cruel irony, Plaintiff's summary judgment submissions in this case rely heavily on the now-vacated district court opinion in *Burroughs* (Doc. # 16, Ex. 13), pointing out that the *only difference* between the LTD Plan in *Burroughs* and the STD Plan in this case is that with regard to the former, the Trust paid the beneficiaries directly whereas with respect to the latter, the Trust pays BellSouth. (Doc. # 15, at 14-15). Plaintiff argues that "[t]he *Burroughs* [district court] opinion is precedent in this district and . . . respectfully suggests that the court should be consistent and follow *Burroughs* . . . [regarding] the effect of the 'Trust' on benefit payments." (Doc. # 15, at 14-15). Unfortunately for Plaintiff, the similarities between the facts of this case and the facts of *Burroughs* (that previously she pointed out and championed as part of her arguments here) now inure to her detriment. Although *Burroughs* was not selected for publication and thus is not binding precedent, it is nonetheless persuasive reasoning that leads this court to reject Plaintiff's attempt to use evidence regarding the nature of the Trust to show that a conflict of interest exists in this case. *See* Eleventh Circuit Rule 36-2. Accordingly, this court concludes that the heightened arbitrary and capricious standard does not apply here. Instead, the court will review the decision in this case pursuant to the *regular* arbitrary and capricious standard that is akin to an abuse of discretion review.

## 2.    Application of the Standard

In applying the arbitrary and capricious standard, "this Court's role is limited to determining whether [Broadspire's] interpretation was made rationally and in good faith—not whether it was right." *Guy v. Southeastern Iron Workers Welfare Fund*, 877 F.2d 37, 38 (11th Cir. 1989). Broadspire's decision to deny Plaintiff's claim for STD benefits may be reversed only if the decision is "completely unreasonable." *Sclafani v. Central States Pension Fund*, 795 F. Supp. 400, 402 (S.D.

Fla. 1992), *aff'd without op.*, 998 F.2d 1021 (11th Cir. 1993).  The decision of the plan administrator "need not be the best possible decision only one with a rational justification."  *Griffis v. Delta Family-Care Disability Plan*, 723 F.2d 822, 825 (11th Cir. 1984).

If a reasonable basis exists for the decision made by Broadspire, "it must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision." *Jett v. Blue Cross & Blue Shield, Inc.*, 890 F.2d 1137, 1138 (11th Cir. 1989); *see also Sharron v. Amalgamated Ins. Agency Servs., Inc.*, 704 F.2d 562, 564 (11th Cir. 1983) ("a court should enforce a decision of pension fund trustees even though the court may disagree with it, so long as the decision is not arbitrary and capricious").  "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."  *Davis v. Kentucky Fin. Cos. Retirement Plans*, 887 F.2d 689, 693 (6th Cir. 1989), quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985).

Here, the reasons for the denial of Lee's claim for short-term disability benefits are set forth in the final denial letter dated August 5, 2005 from Claudia Russell-Powell, Appeal Coordinator, to Lee.  (BRO 239-242).  The letter indicates that all of the medical information submitted by Lee was considered by the Appeals Review Committee prior to the rendering of a decision.  It is noted that three of Lee's treating physicians, Dr. Goyne, Dr. Gossman, and Dr. Gibson, had previously opined that Lee was unable to work due to chronic pain.  (BRO 240).  Although Plaintiff points to Dr. Gossman's notation that he believed Lee understated her difficulties and he personally observed her in great distress, the Appeals Review Committee determined that Dr. Gossman and Goyne "did not provide any objective documentation to substantiate their statements that you were unable to work." (BRO 240).  Furthermore, the limitations which were described by Lee's treating physicians were

consistent with the sedentary job held by Lee.  The final denial letter noted that "no Functional Capacity Evaluation was submitted for review."

The Appeals Review Committee found that Dr. Gibson's documentation gave no indication that a comprehensive physical examination had been performed.  The Appeals Review Committee found that Dr. Gibson's information failed to include a "description of an examination of the back in terms of response to palpation, range of motion testing, or presence or absence of muscle spasms." (BRO 240).  There was also no description of muscle power or sensation having been tested.  (BRO 240).  Although Plaintiff disputes the Committee's conclusion - noting that Dr. Gibson reported his personal observations from examinations he gave, listed her pain as very severe, referenced the MRI test results providing objective evidence of the pain causing medical condition, referenced her medications, listed her reported complaints, and provided his own evaluation of her condition - the court cannot say that the Committee's conclusions were "completely unreasonable."

The Appeals Review Committee considered and evaluated a thoracic spine MRI which was performed on April 5, 2005, and determined that the MRI did not have "indicate[] a degree of severity of pain consistent with [Lee's] complaints or a degree of severity of pain which would be inconsistent with work." (BRO 240).  A thoracic spine CT performed on April 30, 2005 was also considered, and it revealed a "small right paracentral subligamentous disc herniation at T6-T7 with no cord deformity and the previously seen small left paracentral disc protrusion at T11-T12.  There was no evidence of fracture, osteophyte formation, or spinal stenosis."  (BRO 240).

The Appeals Review Committee also considered records from a consultation by Keith Langford, M.D. on April 21, 2005.  Dr. Langford's report did not include a description of an independent physical examination having been performed on that date.  Dr. Langford referred Lee

to another neurosurgeon, Patrick Pritchard, M.D., for consideration of minimally invasive endoscopic discectomy.

In a report of consultation dated April 29, 2005, Dr. Pritchard described Lee "to be in moderate distress when moving on the exam table.  Muscle strength was grade 5/5 with some give away weakness due to pain.  You had a fair amount of paraspinal muscle tenderness, sensation was intact and the reflexes were 2+ throughout.  There were no long tract signs.  Cranial nerve exam was normal and gait was limited secondary to pain."  (BRO 240).  Dr. Pritchard gave Lee the option of a thoracic discectomy via a microendoscopic approach; however, he stressed that he did not think the procedure would be successful in removing all of Lee's pain because he did not consider all of her pain to be related to thoracic disc herniation, and he also stated that "[a] significant amount of psychological overlay complicates her symptoms."  (BRO 241).

Lee had the scheduled surgery on May 16, 2005.  The Appeals Review Committee determined that Lee was functionally impaired with respect to work from the date of surgery on May 16, 2005 to the time of the final denial letter on August 5, 2005, but the Committee found no objective evidence of a functional impairment which would have precluded Lee from working from January 25, 2005 through May 4, 2005.  (BRO 241).  Because Lee's last date of employment was May 4, 2005, the Appeals Review Committee was unable to address her appeal beyond that date.

The court finds that based on the information obtained during Broadspire's thorough analysis of Lee's claim, as set forth above, Broadspire acted reasonably when it denied Lee's claim for STD benefits and its decision, therefore, should be upheld under the regular arbitrary and capricious standard.  In so finding, the court rejects Plaintiff's contentions that the following evidence suggests that Broadspire's decision was "completely unreasonable:" (1) Broadspire did not order an

Independent Medical Examination to contradict the examination findings of Plaintiff's treating physicians and instead relied only on the Peer Review conducted by a physician retained by Broadspire that is unsupported by any credible evidence,[12] (2) Broadspire allegedly considered only her functional capacity and not her allegations of pain,[13] and (3) the Peer Review relied on functional incapacity criteria to determine benefits.[14]  Accordingly, the court finds that Defendant's decision to

_____

[12] Defendant notes that reliance on a Peer Review - as opposed to an Independent Medical Examination - is not unreasonable because, pursuant to *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003), opinions of treating physicians in the ERISA context are not entitled to any greater deference than those of reviewing physicians and, in any event, Broadspire was not obligated to conduct its own examination of the Plaintiff because Plaintiff has the burden to submit objective medical evidence in support of her claimed disability. (*See* Doc. # 14, at Ex. 4 p BST 084) (STD benefits require "a medical condition, supported by objective medical evidence, which (1) makes [her] unable to perform any type work as a result of a physical or mental illness or an accidental injury. . ..")).

[13] As Defendant points out, the Peer Review conducted by Dr. Vaughn Cohan clearly indicates that he considered her complaints of pain as well as any alleged functional impairment. (Russell-Powell Dec. at ¶ 48, Ex. E, BRO 234-37).

[14] In support of this argument, Plaintiff principally relies on Judge Blackburn's opinion in *Hammock v. BellSouth Tele., Inc.*, N.D. Ala CV04-B-2318-S, which found: "Plaintiff has made no claim that she does not have the physical functional capacity to perform sedentary work. Her STD claim is based on her headache pain. Therefore, whether she can physically sit, stand, lift, and carry is irrelevant to the determination of whether she is disabled due to headaches. A finding that plaintiff is not disabled because she has the physical functional capacity to perform sedentary work is arbitrary and capricious."  *Hammock v. BellSouth Tele., Inc.*, N.D. Ala CV04-B-2318-S, Mar 31, 2006 Opinion p. 19).  *Hammock* is not binding on this court and, in any event, the facts in this case differ greatly from *Hammock*. Judge Blackburn specifically noted in *Hammock* that the Plan at issue in that case did not require objective medical evidence of disability. *Hammock*, Mar 31, 2006 p. 19 ("As set forth above, the Plan does not require objective evidence of inability to work . . . .Therefore, rejection of plaintiff's claim because the Plan requires objective evidence was arbitrary and capricious."). Here, however, the STD Plan specifically defines disability as "a medical condition, supported by objective medical evidence." (Doc. # 14, at Ex. 4 p BST 084).  As the Peer Review indicated: "While the claimant would be functionally impaired with respect to work from the date of surgery to the present time, nevertheless I do not find objective evidence of a functional impairment which would have precluded her from work from 1/25/05 until the date of surgery. Despite her complaints of pain, nevertheless the medical records are not indicative of a degree of pain or intensity of pain which would have precluded her from performing sedentary work. **The**

deny Plaintiff's STD benefits is due to be upheld as reasonable and therefore, Defendant's motion

for summary judgment on this claim is due to be granted.

### B.     Denial of Long-Term Disability Benefits

Given the court's decision to grant summary judgment on Plaintiff's claim for STD benefits,

summary judgment is also appropriate on Plaintiff's claim for LTD benefits.  The undisputed

evidence shows that to even be eligible for an award of LTD benefits under BellSouth's Plan, STD

Plan benefits must have been approved and all 52 weeks of STD Plan benefits must have been

received. (LTD Plan at p. 4; BST 0118).  Broadspire will not even process a claim for LTD benefits

unless all 52 weeks of STD Plan benefits have been exhausted.  Therefore, as Defendant recognizes,

"in order to have been eligible for the payment of LTD benefits, Plaintiff would have needed to

receive STD benefits continuously up to and including January 25, 2006." (Doc. # 17, at 11).  As

Plaintiff concedes, "the appropriate action is for the court to award LTD benefits if the plaintiff

prevails on the STD claim and to not award LTD Plan benefits if the plaintiff does not prevail on the

STD claim." (Doc. # 12, at 26-27). Therefore, the court does not reach the merits of Plaintiff's LTD

benefits claim[15]  nor the evidence submitted in support thereof.[16]

_____

**objective findings including those seen on the claimant's imaging studies are not consistent
with the degree of pain which she reports.**"  (BRO 234-37; (Russell-Powell Dec. at ¶ 48)
(emphasis added).

[15]  The court also need not consider Plaintiff's collateral estoppel argument regarding
exhaustion of administrative remedies regarding her LTD claim. Plaintiff argues in her initial brief
that based upon *Brewer v. BellSouth Tele., Inc.,* No 02-11159 (11th Cir. Mar. 12, 2003)(Doc. # 14,
Ex.9) - in which the Eleventh Circuit found that Judge Acker did not abuse his discretion in choosing
not to apply the exhaustion requirement to plaintiff's LTD benefits claim because exhaustion would
have been futile given that any award of LTD benefits was contingent upon the receipt of STD
benefits - BellSouth should be collaterally estopped from arguing that Plaintiff failed to exhaust her
administrative remedies regarding her claim for LTD benefits in this case.  (Doc. # 12, at 25-27).
Even assuming that Plaintiff is relieved of her exhaustion requirement as to her LTD benefits claim,

C.      **Wrongful Termination**

The court will not entertain Plaintiff's claim - which is asserted for the first time in her

motion for summary judgment - that the termination of Plaintiff's employment was a violation of the

terms of the plan and a violation of ERISA §510, 29 U.S.C. §1140.  (Doc. # 12, at 19-20)(citing to

*Godfrey v. BellSouth Telecommunications, Inc.*, 89 F.3d 755[17] (11th Cir. 1996)).  Plaintiff urges the

court to "treat the termination of Ms. Lee's employment as if it had never occurred and to award

benefits from January 25, 2005 to January 24, 2006 representing all 52 weeks of Short Term

Disability Plan benefits."  (Doc. # 12, at 20).  Nonetheless, Plaintiff's Complaint contains only two

counts - one for STD benefits and another for LTD benefits - and was never amended to allege a

claim for wrongful termination under § 510 of ERISA.  (Doc. # 1).

_____

LTD benefits are still not due to be awarded because the court has concluded that the denial of her
STD benefits claim should be upheld.

[16] In any event, there is no current medical information in the Rule 56 record which would
support the payment of STD benefits after mid-2005 or LTD benefits after January 25, 2006. The
evidence submitted by Plaintiff in support of her assertion that she has been disabled from mid-2005
until today (*see* Doc. # 19, at 9-10), consists solely of the Social Security Administration's decision
to award her benefits, which is not binding nor determinative, and Dr. Gibson's April 5, 2005 letter
opining that she is "permanently and totally disabled," which does not constitute current information
regarding her condition after mid-2005.  Thus, the record is devoid of any substantial evidence
regarding Plaintiff's medical condition after her scheduled surgery of May 2005.

[17] Plaintiff's brief provides the incorrect cite for *Godfrey* as 89 F.3d 1547.  (Doc. # 12, at 19-
20).  In any event, Plaintiff's citation to *Godfrey* is inapposite as the plaintiff in *Godfrey had asserted*
a § 510 claim in her complaint and therefore had provided an adequately-pled basis upon which the
Eleventh Circuit could find that the defendant in that case had violated ERISA's anti-retaliation
provision by threatening to discharge the plaintiff if she stayed home and disciplining her when she
did stay home.  *Godfrey*, 89 F.3d at 759-760.  Here, there is no such claim in the case. Moreover, the
parties do agree that had Lee returned to work, she would not have been entitled to STD Plan
benefits from the date she returned to work because partial day benefits had not been approved.
(Doc. # 14, at Ex. 4 p BST088).

This court need not consider claims raised for the first time on summary judgment. *See e.g.,* *Thomas v. T.G. Egan*, 1 Fed. Appx. 52, 54 (2nd Cir. 2001)(finding that claims raised for the first time after the summary judgment deadline are due to be dismissed); *Beckman v. United States Postal Service,* 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000)(same).   It is a fundamental principle that a complaint must state Plaintiff's claims plainly.   Fed. R. Civ. P. 8(a).   Although courts have considerable discretion to allow parties to amend their complaints, *Plaintiff* must take the initiative to do so.  *See Marsh v. Butler County*, 268 F.3d 1014, 1035 (11th Cir. 2001 )("When Plaintiffs have had ample opportunity to amend their complaint, but have failed to do so, nothing compels us to remand to amend... when plaintiff failed to request leave to amend the complaint in district court."); *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1319 (11th Cir. 1999) (finding no obligation for a district court to *sua sponte* grant leave to amend).[18]

---

[18] Even if the claim had been properly pled, there is no evidence in the Rule 56 record before the court to support it.  In order to prove a *prima facie* of unlawful discharge under § 510, a plaintiff must show that she: (1) is entitled to ERISA's protection; (2) was qualified for the position; and (3) was discharged under circumstances that give rise to an inference of discrimination. *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217 (11th Cir.1993).  Specifically, a "plaintiff does not have to prove discriminatory intent but must introduce evidence that suggests interference with ERISA rights was a motivating factor." *Id.* (citation omitted).  Here, Plaintiff has presented no evidence that BellSouth terminated her in order to deprive her of benefits under any ERISA plan applicable to her during her employment.  In fact, the only "evidence" cited by Plaintiff in support of her assertion that "BellSouth demanded that she give up her benefits claim appeal and return to work or be fired" makes no mention of her benefits claim or her appeal.  (Doc. # 12, at ¶ 26 (citing Doc. # 14, at Ex. 6 p. Lee 01)).  The letter to which Plaintiff cites does indicate that BellSouth gave her an ultimatum – just not the one that she claims.  BellSouth informed her by letter dated April 26, 2005 that if she did not return to work by May 4, 2005 she would be terminated based upon her exhaustion of FMLA leave - not her benefits claim appeal.  (Doc. # 14, at Ex. 6 p. Lee 01).  Other evidence before the court indicates that BellSouth represented to Broadspire that Lee's termination had nothing to do with her benefit claim.  (Doc. # 14, at Ex. 3 p BST181).  On August 3, 2005, a BellSouth manager talked to Broadspire's representative and confirmed that Plaintiff was no longer employed and that her termination was not based on her denial of STD benefits.  (BRO 181).  Thus, even if a § 510 claim were properly before the court in this case - and it is not - the only evidence in the Rule 56 record indicates that Plaintiff's termination had nothing to do with her benefits claim appeal.

Apparently realizing that she failed to plead such a claim in her complaint, Plaintiff takes a new approach in her reply brief and without any citation to case law, attempts to rely upon § 510 as a defense mechanism to preclude BellSouth from pointing to her termination and lack of employment with BellSouth as the reason why she was not paid STD benefits after May 4, 2005.[19] This construction of § 510 has no merit[20] and deserves no further discussion.

## IV.    CONCLUSION

For the reasons explained above, Plaintiff's Motion for Summary Judgment is due to be

_____

[19] Frankly, the court had difficulty deciphering this argument in Plaintiff's reply:

Lee does not seek a pre termination injunction or any other affirmative relief for violation of 29 U.S.C. §1140.  ERISA does not provide for damages of any kind. Plaintiff claims entitlement to all 52 weeks of STD Plan benefits and to LTD Plan benefits.  To the extent BellSouth asserts the termination of employment as a basis to deny those benefits, BellSouth proves a violation of 29 U.S.C. §1140.  The court can award benefits for the full term of 52 weeks of STD Plan benefits with nullifies the termination.

If, only if, and to the extent that, BellSouth interposes the termination of employment as a bar to recovery of STD Plan or LTD Plan benefits does §1140 come into play to preclude BellSouth from asserting that the termination of Ms. Lee's employment cuts off benefits.  This provision is merely a statutory bar to a possible defense BellSouth could have, but apparently did not, assert.  Should BellSouth now or in the future argue that the termination of Ms. Lee's employment prevents STD Plan benefits after May 4, 2005, then §1140 bars that assertion.

(Doc. # 19, at 4).

[20] Likewise, the court gives no credence to Plaintiff's argument that the decision to terminate her employment violated section 5.13 of the Plan, which states that an independent medical examination must be conducted before an employee's employment is terminated.  (Doc. # 14, at Ex. 4 p BST092).  As Defendant points out, Section 5.13 of the STD Plan did not even apply to Plaintiff as it is triggered only when the employee whose employment has been proposed for termination has already been approved for benefits:  "if a  Participant is no longer considered to be Disabled, but does not return to work . . . ."  (Doc. # 14, at Ex. 4 p BST092).

denied and Defendant's Motion for Summary Judgment is due to be granted.  The court will enter

an order consistent with this Memorandum Opinion.

      **DONE** and **ORDERED** this     1st      day of October, 2007.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

32